Hector Del Bosque-Apolli v. Stephen Seidman My name is Matthew Rakusik, and I represent EmployCoUSA in the above-captioned case. This is a disputed case on appeal from the Illinois Workers' Compensation Commission. At the commission level, there were several issues in dispute. There are only two issues being presented to the court. These two issues address the question of average weekly wage and the question of whether the physician violated the two-physician rule set out by Section 8A.3 of the Act. I'm going to address the two-physician rule question first. It's the shorter of the arguments. I want to spend most of my argument talking about wage. Section 8A of the Illinois Workers' Compensation Act requires that an employer pay for all medical treatment for emergency medical care and for treatment relating to two choices of physician. And the courts, this court and the Supreme Court, when looking at the two-physician rules, acknowledge what is called a chain of referral. One physician refers it to another. That stays within the same chain of referral. And the question in this case is whether there exists any chains of referral. The facts introduced in the record show that three providers provided medical treatment to the petitioner for his allegedly work-related injuries or his now-accepted work-related injuries. His first choice of the physician was Dr. Chorba, his primary care physician. This is not emergency medical care. The petitioner first saw Dr. Chorba one week after the accident on October 16, 2018. There is nothing in the record to suggest emergency medical care anywhere. Dr. Chorba's records were introduced at trial. In those records, there is no references to any referrals made by Dr. Chorba to any of the other physicians in this case. Petitioners then chose to seek treatment at Illinois Bone and Joint Institute. He first sought treatment at Illinois Bone and Joint Institute on November 26, 2018. The records introduced by petitioner from Illinois Bone and Joint Institute include patient intake history forms. Where the petitioner was given the opportunity to list a referring physician, he did not do so. But on that very same form, the petitioner did identify Dr. Chorba as his primary care physician. Petitioner knew he could have knew about this form. He completed this form but chose not to indicate Dr. Chorba was his referring physician. And none of the records from any Illinois Bone and Joint Institute physician indicates that the petitioner had been referred to that location by Dr. Chorba, the only prior physician in this case. What's in Dr. Peterson's note? I'm sorry, in whose note? Dr. Peterson. Dr. Peterson's notes, forgive me, Dr. Peterson, there is a Dr. Polinkovich from Suburban Orthopedics that does note a referral had been made, but no indication of who had provided a referral. And moreover, it was actually made to a doctor that was outside, was in the petitioner's third choice of physician. Well, let me ask you a question. Dr. Peterson's notes, his name's Kyle Peterson, by the way. He records in his notes of March the 15th, 2019, that the primary care physician was Chorba. And according to the notes, patient was referred to Illinois Bone and Joint Institute. Referred by who? The only other doctor he saw was Chorba. Your Honor, it is a petitioner's burden to prove who provided that referral. Hold on a second. The commission gets to interpret these facts and determine what inference they choose to draw so long as it's reasonable. He saw Chorba on what date? He saw Dr. Chorba October 16th of 2018. And when did he have an MRI? The MRI occurred shortly thereafter. Forgive me, I don't have the exact date in front of me. When did he first go to Illinois Bone and Joint? November 26th of 2018. All right. So how much time is between the time he saw Chorba last and the time that he went to Illinois Bone and Joint? Just a matter of weeks at most, Your Honor. And where would Peterson get the notion that he was referred to Illinois Bone and Joint? It had to be from the petitioner because the records themselves are completely absent. It certainly had to be. So who do you suggest referred him if it wasn't Chorba? Who else did he see? Well, Your Honor. If it wasn't Chorba in Illinois Bone and Joint. Your Honor, the fact of the matter is claimants receive referrals from a variety of different people. It could be from a family member. It could be from a friend who had treated with a doctor. It could be from an attorney involved in the case. It could be and it could also come from Chorba. It could have, but Chorba did not document that in his referral. That is not documented in the records from Illinois Bone and Joint Institute. And the key factor is petitioner also offered no testimony. And while Your Honor's position regarding the inferences is well accepted. If we look at what the Supreme Court has said regarding inferences, and I would like to encourage this court to take a look at Gold National Batteries Incorporated versus Industrial Commission. It's a 1966 decision of the Supreme Court. It says, however, if there is no substantial evidence to support an award, it is the court's duty to set it aside. So here we've got the commission apparently making an inference that he had been referred by Chorba to Illinois Bone Institute, which is only reported by the third provider, which does not indicate who made the referral and has no supporting testimony from the petitioner. How can that be said to be substantial evidence to support an award as required by the Supreme Court? And because there is no substantial evidence, a respondent requests that this court find that the commission erred and that no rational trier of fact could have found a simple statement to a third physician that a petitioner had been referred by parties yet unknown to a doctor is substantial evidence sufficient to meet his burden of proof under Section 8A of the Act. Excuse me, didn't Dr. Chorba say something in his either deposition or somewhere along the record that he would certainly rely on a surgeon for complete or more thorough analysis? And wouldn't that indicate that he had sent him to a surgeon for that purpose? Not at all, Your Honor, because if Dr. Chorba is a primary care physician, his specialty is not surgery. And simply acknowledging that a surgeon is better suited to talk about surgical issues is the same as if I was to defer to a tax lawyer to better to talk about taxes. It's just an acknowledgement of the defects in his knowledge. Now, the main issue presented before this commission is the question of average weekly wage. In this case, we have a commission that overturned in a two to one decision, a decision of the arbitrator, and basically disregarded the wage records presented at trial to find that the petitioner worked a 40 hour work week. Not only is that a mistake of law, given the fact that the commission outright ignored the plain language of the statute, which requires the use of the actual wage records, it would also be a mistake of fact, because there is simply no evidence or testimony anywhere that the petitioner was a full time employee, that he worked a 40 hour work week. In fact, the wage records presented in this case shows that the petitioner worked three weeks. The first week, he worked a total of 18 hours. The second week, he worked a total of eight hours. The third week, he worked a total of eight hours. So, over that three week period, the petitioner worked a cumulative total of 32 hours. Yet the commission, in its wisdom, chose to find that the petitioner is a full time employee and his proper calculation would not be to use those wage records, but for his hourly rate. I'll give the commission credit. They used his hourly rate from the wage records and multiply that by a 40 hour week. And that is not consistent with Sylvester, let alone the Ricketts decision from this very court. When looking at the question of whether to use weeks and parts thereof analysis, this court, I believe its most recent conversation I could find with Thiel versus Industrial Commission. I'm sorry, Workers' Compensation Commission. It's a 2014 Rule 23 of the decision of this court that said the threshold finding when determining whether the weeks and parts thereof analysis is proper is whether the petitioner has proven the number of days lost from work. In this case, he never testified to any number of days lost from work. What we have here is a petitioner who testified that he would try, I'm sorry, his exact word is most of the days he would work an eight hour day. That would be found on page 97 of the record. But it's really pages 100 and page 101 of the record that talks about what he would work. And petitioner testifies that his hours would vary, that he would only work a certain number of hours necessary to get a job done. That his employer would cut number of hours available to the petitioner if there were too many employees. That at the end of the day, he would be told if he needs to come in the next day. And at the end, and only when he comes in the next day, would determine how many hours he would actually work. And that would depend on the workload available. None of those facts support the commission's finding that he worked a 40 hour work week. Was there any historical evidence that there were different seasons where the employees worked more or work less? No, petitioner failed to present any evidence of his own in this case. The only documented evidence on the issue of wage came from respondent. It was his actual wage records, which were introduced in the record as page 714. Now, it is respondent's position that this case falls under this court's decision in Ricketts. Where this court found that a claimant has the burden of proving that he worked a 40 hour work week. And quite frankly, that there was no presumption of a 40 hour work week. Keep in mind, this petitioner didn't even work 40 hours in the three weeks he was employed by my client prior to his injury. There is no evidence presented by the petitioner that he would work a 40 hour work week. The Sylvester decision relied in part on a contract between the respondent. I'm sorry, the employer and the union that mandated a 40 hour work week. If such a contract exists, petitioner didn't present it. I have no evidence. There's nothing in the record to suggest it exists. The only testimony that was presented in the record by the petitioner was was at best contradictory. Amongst itself, petitioner initially tested, he worked, testified, he worked six weeks from the respondent. His attorney quickly corrected that because the actual wage record showed he didn't work six weeks. He then testified again that most of the days he works an eight hour day saying I work. Most of the days working an eight hour days is not the same as saying I work a regular 40 or eight hour day. And it certainly doesn't indicate how many days a week he would work or be scheduled to work. And even if this court was to adopt a typical eight hour work day for the petitioner, he's still a part time employee. He there is no evidence to suggest he works a full time schedule. No evidence to suggest he worked a regular 40 hour work week. And as such, the weeks and parts there of analysis would not be proper. Like the decision in Ricketts, which was distinguished in Sylvester. It's this case involves insufficient evidence presented by petitioner to meet his burden of proof. For these reasons, respondent asked that this court set aside the decision of the Illinois Workers Compensation Commission. And reinstate the arbitrator's finding with regard to average weekly wage, as well as to I see my time is up. Thank you. Yes, it is. I have time in reply. Thank you. Thank you. Mr. Seidman, you may. Yes, please. The court, Steve Seidman, on behalf of the petitioner. First, with regard to the two doctor choice rules, there is very substantial evidence in the record. Not only is Justice Hoffman pointed out, Dr. Peterson stated in his record. So did Dr. Polankiewicz. And the only evidence in the record is is a notation, the suburban records that suggest. And that's Dr. Polankiewicz, as well as Dr. Peterson, that petitioner had been sent to Dr. Clay, I, B, I, J. That's all my bone and joint. And the the response from the the appellant in this situation is, is that the evidence isn't substantial enough. The only evidence extant in this record is that the petitioner saw Dr. Chorba, who then was referred him to I, B, I, J. And Dr. Clay and Dr. League. And thereafter, petitioner chose his choice of a second choice with regard to Dr. With suburban orthopedics and Dr. Peterson. He also saw Dr. Polankiewicz. The notations in the records are extant. The only evidence extant is exactly that. There's no concert there. Contradictory evidence. And in fact, when I was a young lad, I once asked the doctor, could something or something else happen? And he said, you know, Mr. Seidman, a cow could jump over the moon. That's not our standard here. Our standard is what evidence exists in the record. And the evidence, the only evidence that exists in the record is that the two chain or the two doctor rule was indeed complied with. As we all know, a petitioner has the right to go to two doctors of his own choice. And they were referring to the fact is there are three doctors here, but only two of which Dr. Chorba, who referred him to I, B, I, J. And and then thereafter, suburban orthopedics. Your opponent is going to question. How do you know it was Chorba that referred him? Well, the only evidence extant is that there's no evidence to the contrary. And it gets to a credibility decision. Wait a minute. There is no evidence Chorba referred him. There may be an inference that Chorba referred him, but there is no evidence. Both Plankovich and Peterson merely said sent to or referred to. They never indicated who did the referring. Well, the burden of proof, I think, was met because clearly there was no rebuttal from anyone other than to speculate that by by the appellant, there is speculation that this gentleman could have been sent by a friend by his lawyer is what I think I heard during the argument. And there's absolutely no evidence to to rebut the inference even. So the only and I know your honor, it's it's it's it's evidence that an inference is led from because that's what we have in the record. And that's what we have in our records is indeed that. This is where this gentleman came from. By virtue of the fact there is no contradictory, no rebuttal evidence. Once the burden of proof is met, it's met. Whether it's an inference, it is based on evidence in the record. With regard to the end, and there is a credibility, it seems. And I pointed out in the briefs with regard to that, that he's that appellant is somehow saying that the credibility of petitioner was somehow impugned. But that decision has obviously left to the commission and any credibility questions are with regard to the average wage calculation. I see it differently than appellant. I think this is absolutely a Sylvester type of case. And in fact, we have to take into consideration that this gentleman went to for this employee. This employer and McCormick place, they set up shows. There are only certain amounts of shows and certain times and periods that they're brought out. And if we look at the plain meaning of the act, as the commission pointed out. The unrebutted testimony was that petitioner worked for employee co for approximately 3 weeks prior to the accident in that 3 weeks. He worked 32 hours. There were 8 hours deducted. We know that. Okay, I want to make sure that I'm correct in the manner in which the commission calculated. The commission multiplied the claimants regular hourly wage of 47 dollars and 35 cents. By the number of hours, 24. That he was paid in his regular rate of pay in the 3 weeks prior to the accident. To arrive at 1136 dollars and 40 cents. The commission found that the only testimony. In the evidence where they work 8 hour work days. And the commission found that 1100 36 dollars. And 40 cents was the equivalent of 3 working days. At his rate of pay, they divided 1136 40 by 3. To arrive at a daily rate of pay a 378 80. And then multiply that at 5. To come up with an average weekly wage of 1894 dollars. Is that correct? That's correct. Which 1 of the 4 methods. Under section 10 of the act, does that calculation fall into. Which 1 of the 4 message under section 10. Yeah. Reading section 10 says if the injured employee. Lost 5 or more calendar days during such period. Whether or not in the same week. Then the earnings for the remainder of such 52 weeks shall be divided. By the number of weeks and parts thereof remaining. After the time, so lost. Has been deducted. Now, why don't you look at the 3rd method? Where the employer prior to the injury. Extended over a period of less than 52 weeks. The employees earnings during that period are divided by the number of weeks and parts thereof. During which he actually earned wages. And tell me why that doesn't apply. You're saying, and I apologize, your honor. I'm just trying to get to the right part of section 10. It says the compensation. So can be computed. On the basis of the average weekly wage, which will mean the actual earnings of the employee and the employee employment. In which he was working at the time of the injury. During the period of 52 weeks. Ending with the last day of employees, last full period. Immediately proceeding the date of injury. Is that the 1? No, I'm, I'm, I'm looking at Sylvester. Setting up methods for computation. And the 3rd method that's used. Is when the employee. Employment extended over a period of less than 52 weeks. Which clearly is the case here. Well, yes, it's definitely less than 52 weeks. You were using Sylvester use the second method. Identified for computation. You're using the third method. Identified for computation. Because that was an employee. That. Lost five or more calendar days in a 52 week work year. In this particular case. Will occur to me. That he falls under number three. And if he falls under number three. Then by using. The 32 weeks. I think it was 32 or 34 weeks city. Hours that he actually worked during that 3 week period. You arrive at. The exact computation that the arbitrator arrived. Well, I would disagree that that part of the provision applies. I think Sylvester. Interprets these provisions to mean that the number of weeks used to calculate the average weekly wage. Should be found by dividing the total. The number of days worked. By five. And that's precisely what the commission did in this case. So respectfully honor your honor. I would disagree. When a person works 24 hours. Over three weeks, excluding the five days of section 10. Plain meaning says, I think that that's the way it should be done. How about those, those. Extra eight hours that he worked. You've excluded them in their entirety. Yes. That's correct. That's because it got paid double time. They were for holidays. And that's. You would exclude the bonus portion. He wouldn't exclude the number of hours work. No, and then numbers of hours would have been exactly the same. If they would have, if they took away or added in the 32, it would be the same. Except for those two days, it got paid double time. So they took away the double time for the two days. And of course made the 34 hours less the eight. That's how they got to the 32 hours. Let's see. To the 24 hours. So you could add back in those eight hours per day. The, the 32 or the eight hours that he did. The two days he worked double time. And or that one day. And you would still have the same calculation. Once again, do you disagree with the statement? That Sylvester. Stands for the proposition. That there are four methods of calculating average weekly wage under section 10. I don't disagree with the statement. I don't disagree with the statement. And what I, what I respectfully disagree with. Is in this case, the fact that this individual. 24 hours over three week period. And the only evidence is. He worked eight hours a day. Get you to the calculation, which Sylvester mandates. How many weeks. Did the petitioner. In Sylvester, did he work a full 52 week here? I do not believe so. I don't. A couple of weeks. I think I do not believe so. And, you know, I. I'd like to say that I knew for sure, but I don't know. I can tell you for sure that Sylvester use what they identified. As the second method of calculation. Lose five or more calendar days during the 52 week period. Prior to the injury or parts thereof. But they identified the third week. The third method. And that's the method where the employer employment prior to the injury. Extended over a period of less than 52 weeks. And that clearly is the case here. And so I'm wondering if Sylvester's. Your argument based on Sylvester. Really applies because it's a different method of calculation. Well, I think. I believe it does. I think that. Just because it's a different method of calculation. If you use. What the plain meaning of section 10 says and couple it with. Sylvester. You get to the exact analysis that the commission. Arrived at. Exactly. And if you want to go back to Ricketts. And, and use Ricketts as an example. As I pointed out in the brief. That comes to a higher average with a QH. So actually. Given the plain and ordinary meaning of weeks and parts thereof. Three day cut three days constitute three sevenths of a week. And if you want to go back to Ricketts. Pursuant to the third method. Set out in section 10. We get, we, you could theoretically get under Ricketts. 2,655. 14, as I pointed on page 16. Of the brief. So. I just, I would tell you that I believe the plain meaning of section 10. Coupled with the fact that the evidence in this case showed that over. A 20 over. You work 24 hours over three weeks. Eight hours a day is within the plain meaning. Of Sylvester and section 10. And with that, I will conclude. Very good. I have one question. Is there any, is there anything in this record that says that he worked a single eight hour day? The evidence was. What that, that he said was, and I quote. Was on most days. Let me. Your honor, I'll get to the exact book, but it was on most days. He worked. In eight hour day. So that. That is the evidence in the record. The actual statement. That was on most days. That he said. I'll get you the exact quotes. But that was what he had said about his, his working. He said, however, most of the days that I worked eight hours a day. That was the, the actual statement in the record he made. But that was his statement. So that's the evidence in the record. That he said not anything produced by the company or. In fact, it was unrebutted. And then the wage records from the company indicated the. The 24 hours. 24 hours. And that's how they got there. Well, at eight hours a day. I did. I went to law school because there was no math, but there is some math here. So I'm having to use it. I'm having to use it.   I'm having to use it. If, if he worked 24 hours, that's three days. Correct. And that's exactly what the commission got in. And I, thankfully I've got a Dean college algebra. So. It was a disaster for me. But I will tell you that it took me a little while to figure this out a long while, but. He actually, over the three period work to 24 hours, And then they got to the calculation. As justice Hoffman pointed out. That that's three fifths of 0.6 of a week. And then the total is, is 1800 and some odd dollars. After you do five fifths. Thank you. Thank you. Any other questions from the court. No math questions. Well, that's an old saw. Any other questions? Okay. Mr. You may reply. Justice Huffington. I appreciate your last question to the petitioner, but again, I would just like to highlight the incompleteness. Of Mr. Sideman's answer. Petitioner does testify that most of the days he worked in eight hour days. But that's not his only testimony. His other testimony again, included that his hours would vary. That he would only work the number of hours to get it done. That he would be told if he'd be needed the next day. And that the number of hours would work would depend on the workload. I implore you to not just limit yourself to page 97 of the, of the record, but also look at his testimony. On pages 100 and carrying over to 101. Because to say the petitioner. Unrebutted testimony is that he worked an eight hour day. Most of the days ignores his own testimony about the times he doesn't work an eight hour work day. Regardless petitioner did not present any evidence. Of a 40 hour work week. And instead, and going to back to the question of the. To physician rule petitioner seems to imply. That respondent has a burden of disproving that which petitioner has failed to prove. The petitioner has not presented any evidence to show a referral from Dr. Chorba to Illinois bone and joint Institute. And this court has stated. Uncooperative testimony that support award. For benefits only if a consideration of all facts and evidence and circumstances support that decision. That's the, that's what this court said in Gallatin versus industrial commission. And it's cited Caterpillar versus industrial commission, the Supreme court for that effect. Here, we do not know who provided the referral. It's not in the record. It could have been in the record. And had petitioner got up there and said, I was referred by Dr. Chorba to Illinois bone and joint Institute. We wouldn't be having this conversation because that would be enough. But we've got here is an incomplete statement. And just as a final point, if we were to look at the. The mileage cases, general tire and the cases following general tire, that talk about. Whether it is reasonable for a petitioner to travel beyond the local area and recover mileage for treating with a physician. Outside of, of the local area, this court has recognized that it may be reasonable to do so when a patient chooses to treat with that physician, because he had been referred by friend and family. And if this court will recognize that a petitioner can be referred by friend and family in a mileage case, it should absolutely make the same recognition in a case involving the two physician role. Thank you. Any other questions from the court? No, thank you. Okay, very good. Thank you.